# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ARVIN-MICHAEL TURNER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-0643 (RBW) |
| | ) | |
| ERIC SHINSEKI, Secretary, | ) | |
| United States Department of Veterans | ) | |
| Affairs, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>MEMORANDUM OPINION</u>

The plaintiff, Arvin-Michael Turner ("Turner"), brings this action against Eric Shinseki, in his official capacity as Secretary of the Department of Veterans Affairs,[1] pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e (2006), and the Civil Rights Act of 1991, 42 U.S.C. § 1981 (2006), asserting claims of discrimination, retaliation, and hostile work environment.[2]  Currently before the Court is the defendant's motion to dismiss and motion for judgment on the pleadings pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(c) or, in the alternative, for summary judgment pursuant to Rule 56.  After carefully considering all of the parties' pleadings, the defendant's motion, the plaintiff's opposition, and all memoranda of

---

[1] The plaintiff's Complaint ("Compl."), filed April 5, 2007, named R. James Nicholson, the Secretary of the Department of Veterans Affairs at that time, as the defendant in this case.  The Court has substituted Secretary Shinseki as the defendant in lieu of former Secretary Nicholson pursuant to Federal Rule of Civil Procedure 25(d).

[2] It is unclear from the plaintiff's Complaint whether he is actually asserting a hostile work environment claim.  However, both parties address the claim in their briefs; therefore, the Court will address the claim in this opinion.

law and exhibits submitted with these filings,[3] for the reasons set forth below, the Court concludes that it must grant in part and deny in part the defendant's motion to dismiss and motion for judgment on the pleadings, and grant the defendant's motion for summary judgment.

## I. BACKGROUND

Viewing the facts of this case in the light most favorable to the plaintiff, as the Court must, the facts that form the basis for the plaintiff's claims are as follows.[4]

The plaintiff is an African-American male who was employed for fourteen years as a Medical Technologist at the Department of Veterans Affairs Medical Center ("VAMC"), Pathology and Laboratory Service ("Pathology Service") division, in Washington, D.C.[5] Complaint ("Compl.") ¶¶ 16-17; the defendant's Statement of Material Facts as to Which There Is No Genuine Issue ("Def.'s Stmt.") ¶ 1. "The lab where [the p]laintiff work[ed] is open 24 hours a day, seven days a week, and has three shifts—morning, evening, and night." Def.'s

---

[3] In addition to the plaintiff's Complaint and the Defendant's Motion to Dismiss and Motion for Judgment on the Pleadings or, in the Alternative, Motion for Summary Judgment ("Def.'s Mot."), the Court considered the following documents and attachments thereto in reaching its decision: (1) the defendant's Answer; (2) the defendant's Statement of Material Facts as to Which There Is No Genuine Issue ("Def.'s Stmt."); (3) the defendant's Memorandum of Points and Authorities in Support of Motion to Dismiss and Motion for Judgment on the Pleadings or, in the Alternative, Motion for Summary Judgment ("Def.'s Mem."); (4) the Plaintiff's Motion in Opposition to Defendant's Motion to Dismiss, or in the Alternative, Motion for Summary Judgment ("Pl.'s Mot."); (5) the Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss and Motion for Judgment on the Pleadings, or in the Alternative, Motion for Summary Judgment ("Pl.'s Opp'n"); and (6) the Defendant's Reply in Support of Defendant's Motion to Dismiss and Motion for Judgment on the Pleadings or, in the Alternative, Motion for Summary Judgment ("Def.'s Reply").

[4] The plaintiff has failed to comply with Local Civil Rule 7(h)(1) by failing to include with his opposition to the motion for summary judgment a "concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated." Despite the plaintiff's transgression, the Court has reviewed the record and has attempted to identify the facts that can be construed in the light most favorable to the plaintiff, even though under Federal Rule of Civil Procedure 56(e)(2), the Court could treat all of the defendant's statements of undisputed facts as true. Accordingly, unless otherwise stated, the following facts are either admitted by the plaintiff or do not appear to be in dispute. See cf. Fed. R. Civ. P. 12(b) (stating that "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the Court, the motion must be treated as one for summary judgment under Rule 56").

[5] The plaintiff's employment with the agency concluded in "April or June [of 2006]," due to retirement. Def.'s Mem., Exhibit ("Ex.") 1 (Excerpts of Plaintiff's Deposition Transcript, May 28, 2010 ("Pl.'s Dep.")) at 16:1-4.

Stmt. ¶ 3.  "The evening shift runs from 4:00 P.M. to Midnight."  Id. ¶ 1.  "At all times relevant to this case, [the plaintiff worked] . . . the evening shift . . . ."  Id.

In late 2004, one of the plaintiff's co-workers, Peregrina Lee ("Lee"), was promoted to evening shift supervisor, a position for which the plaintiff had also applied.  Memorandum of Points and Authorities in Support of Motion to Dismiss and Motion for Judgment on the Pleadings or, in the Alternative, Motion for Summary Judgment ("Def.'s Mem."), Exhibit ("Ex.") 6 (Excerpts of Mitra Thompson's E[qual] E[mployment] O[pportunity] ("EEO") Affidavit ("Thompson Aff.")) at 6:18-7:1, 8:18-9:1; id., Ex. 19 (Letter from Plaintiff to Congressman Cummings, Dec. 1, 2004 ("Pl.'s Dec. 1 Letter")).  After Lee was selected as the evening shift supervisor instead of the plaintiff, the plaintiff drafted two letters—one addressed to the Honorable Elijah Cummings, Congressman for the Maryland Seventh Congressional District, and the individuals involved in the selection process, see Def.'s Mem., Ex. 19 (Pl.'s Dec. 1 Letter),[6] and the other addressed only to the Congressman Cummings.  See the Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss and Motion for Judgment on the Pleadings, or in the Alternative, Motion for Summary Judgment ("Pl.'s Opp'n"), Ex. 7 (The plaintiff's December 10, 2004 Letter to Congressman Cummings ("Pl.'s Dec. 10 Letter")).  Both letters expressed the plaintiff's concern "that Black employees, in the Pathology and Laboratory Services of the Agency, were subjected to disparate treatment in hiring and promotions."  Compl. ¶ 23; see Def.'s Mem., Ex. 19 (Pl.'s Dec. 1 Letter) (noting the plaintiff's concern "on how the selection process is not diverse and balanced"); Pl.'s Opp'n, Ex. 7 (Pl.'s Dec. 10 Letter) at 8-11 (referring to the selection of Lee as a "pre-selection," because "management had no

---

[6] The first letter was sent on December 1, 2004, to Congressman Elijah Cummings of the Maryland Seventh Congressional District, as well as to Mitra Thompson, Sabiha Zubairi, Dr. George Netto, and Dr. D. Robert Durfour, the individuals who interviewed Lee for the position and selected the evening supervisor.  Def.'s Mem., Ex. 19 (Pl.'s Dec. 1 Letter).

intention of hiring [a] Black Female;" they just wanted "to make it seem like they [were] consider[ing] a Black Female").  The letters made it apparent to the recipients that the plaintiff felt that he was more qualified for the position than Lee, who had only recently joined the Pathology Service.  See Def.'s Mem., Ex. 19 (Pl.'s Dec. 1 Letter) at 1-2.  The plaintiff, apart from the two letters, did not engage in any further action regarding the alleged discrimination resulting from Lee's selection.  See  Def.'s Mem., Ex. 18 (Final Agency Order) (making no mention of discrimination in the selection process);[7] Def.'s Reply, Ex. 1 (EEO Counselor's Report, April 30, 2005) (mentioning no claim of discrimination in the selection process); Pl.'s Opp'n, Ex. 4 (Complaint of Employment Discrimination) ("Plaintiff's EEO Complaint") (making no claim of discrimination in the selection process); Def.'s Reply, Ex. 2 (Letter from EEO Specialist Dottie Lynn Robinson to the plaintiff, dated September 6, 2005) (informing the plaintiff of the acceptance of his claims, with no mention of discrimination in the selection process); Def.'s Mem, Ex. 6 (Thompson Aff.) at 9:14-17 (EEO Investigator Robinson stating that "we are not investigating the selection [for evening shift supervisor] . . . .").

A.      **January 19, 2005 Report of Contact**

"On January 12, 2005, [the p]laintiff arrived at work and found a slide in his work area from a spinal fluid analysis that was begun by the day shift."  Def.'s Stmt. ¶ 9 (citing Def.'s Mem., Ex. 1 (Excerpts of Plaintiff's Deposition Transcript, May 28, 2010 ("Pl.'s Dep.")) at 32:13-16).  The plaintiff "then conducted a computer inquiry.  After this inquiry, he assumed that nothing further should be done on th[e] slide."  Id. (citing Def.'s Mem., Ex. 2 (Plaintiff's EEO Affidavit ("Pl.'s EEO Aff.")) at 6-7); see also Def.'s Mem., Ex. 9 (E-mail chain between Lee and

---

[7] This exhibit contains multiple documents, causing the pagination to be inconsistent throughout the exhibit; therefore, the page numbers referenced for this exhibit throughout this opinion are the page numbers assigned by the court's electronic filing system.

the plaintiff, January 13-14, 2005 ("January 13-14 E-mail Chain")).  However, the defendant contends that the plaintiff failed to review the communication log requesting that he perform a differential count on the slide specimen, even though, according to Lee, "[e]veryone should check the communication book for endorsement of anything left unfinished."  Def.'s Stmt. ¶ 11 (citing Def.'s Mem., Ex. 3 (Excerpts of Peregrina Lee's EEO Affidavit, dated September 14, 2005 ("Lee Aff.")) at 8:6-8).  When "it was brought to Lee's attention that the count was not done on the slide that had been left for [the p]laintiff . . . she sent him an e-mail."  Def.'s Stmt. ¶ 10; Def.'s Mem., Ex. 9 (January 13-14 E-mail Chain); Def.'s Mem., Ex. 3 (Lee Aff.) at 8:15-9:21.  "In that e-mail, Lee advised [the p]laintiff that the day shift had endorsed the spinal fluid sample to the evening shift for a differential count."  Def.'s Stmt. ¶ 10.  In a series of e-mails, Lee and the plaintiff disputed whose responsibility it was to perform the count on the slide specimen.  <u>See</u> Def.'s Mem., Ex. 9 (January 13-14 E-mail Chain); Def.'s Mem., Ex. 3 (Lee Aff.) at 8:15-9:21.  Specifically, Lee argued that the plaintiff failed to review the communications log from the day-shift, and the plaintiff maintained that checking the specimen's status in the computer was all that was required.  <u>Id.</u>, Ex. 9 (January 13-14 E-mail Chain).  After the initial dispute, Lee verbally requested that the plaintiff verify the specimen.  <u>Id.</u>, Ex. 3 (Lee Aff.) at 14:8-18.  Despite this request, the plaintiff never verified the specimen and Lee ultimately completed the task herself.  <u>Id.</u>, Ex. 3 (Lee Aff.) at 15:7-20.

On January 14, 2005, Lee sent the plaintiff an e-mail regarding two other, unrelated, slides that she said the plaintiff had also failed to properly analyze.  <u>Id.</u>, Ex. 10 (E-mail chain between Lee and the plaintiff, January 14 and 18, 2005 ("January 14 & 18 E-mail Chain")).  In his response to these e-mails, the plaintiff requested that Lee, "when [in the office,] . . . speak to [him] directly," rather than through e-mail.  <u>Id.</u>  The plaintiff felt that Lee was using e-mail

communication as "a form of [intimidation] to scare [him]," and that her use of e-mail was "creating a hostile work environment[.]" Id. (internal quotation marks omitted). In another e-mail, following the earlier exchange, Lee explained to the plaintiff that "e-mail notification is sent to everyone and [that] it [was] not only [the plaintiff who was] in this situation but everyone else as well." Id. Furthermore, Lee stated that her e-mails were not "a form of [h]ostility and intimidation." Id.

On January 19, 2005, Lee issued the plaintiff a Report of Contact. Id., Ex. 11 (Report of Contact, January 19, 2005 ("Report of Contact")). A Report of Contact is a written record of a verbal warning between the employee and a supervisor. See Def.'s Stmt. ¶ 18; Def.'s Mem., Ex. 5 (Excerpts of Mitra Thompson's Deposition Transcript ("Thompson Dep.")) at 48:1-20. The reports are catalogued in order to maintain an accurate record of any incidents. See Def.'s Stmt. ¶ 18 ("Reports of contact serve as records . . . ."); see also Def.'s Mem., Ex. 5 (Thompson Dep.) at 48:1-20 ("[A r]eport of contact is the documentation that a supervisor keeps, because not everyone remembers what happened . . . ."). The Report of Contact regarding the plaintiff cited him for his failure to perform the verification on the slide left by the day-shift on January 12, 2005, as well as his failure to perform the analysis on the two other slides referenced in the e-mails between the plaintiff and Lee dated January 14 and 18, 2005. Def.'s Mem., Ex. 11 (Report of Contact).

## B.    February 18, 2005 Counseling E-mail

The second disciplinary action occurred on February 18, 2005, nearly a month after the Report of Contact was issued, when Lee spoke with the plaintiff about his tardiness.[8] See Def.'s

---

[8] After the majority of the plaintiff's co-workers indicated to Lee that the plaintiff was arriving late to work, Def.'s Stmt. ¶ 23, Lee told the plaintiff during the February 18 discussion, "[y]ou're expected here at work and I am just being fair with everyone else working here in the lab." Id. ¶ 25.

Stmt. ¶ 21.   During that same discussion, Lee also told the plaintiff that he was required to review his e-mail at the beginning of his shift each evening.  See id.  Later that day, Lee sent the plaintiff an him an e-mail memorializing her counseling conversation.  See id.; Compl. ¶ 27; Def.'s Mem., Ex. 15 (February 18, 2005 E-mail from Lee ("Counseling E-mail")).  Among other things, Lee's e-mail reflected that she told the plaintiff "to read the e-mail everyday because there may be directives pertaining to his work that need[] to be addressed before he start[s] to work."  Def.'s Mem., Ex. 15 (Counseling E-mail).

## C.   The Plaintiff's Equal Employment Opportunity Action

The plaintiff initially filed an EEO Complaint on April 20, 2005, concerning the events at issue in this lawsuit.  Def.'s Mem., Ex. 18 (Final Agency Order) at 6.  In his EEO Complaint, the plaintiff alleged that he has was subjected to a hostile work environment, discrimination, and retaliation, based on the two alleged adverse employment actions that the plaintiff suffered—the January 19, 2005 Report of Contact and the February 18, 2005 Counseling E-mail, described in detail above.[9]  Id. at 6-9; Pl.'s Opp'n, Ex. 4 (Plaintiff's EEO Complaint).[10]  On December 19, 2006, "[p]ursuant to EEO Commission Regulation 29 C.F.R. § 1614.109, the [plaintiff's EEO case] was decided without a hearing."  Def.'s Mem., Ex. 18 (Final Agency Order) at 5.  The EEO Administrative Judge found, "[b]ased on the evidence presented and in the light most favorable to [the plaintiff, that he was] not [able to] prove, by a preponderance of evidence, that he was discriminated against and subjected to harassment because of his race," and also was not

---

[9] In his EEO Complaint, the plaintiff also asserted a third adverse action—Lee's failure to "ask [the plaintiff] to cover for her while she was out of the office."  Def.'s Mem., Ex. 2 (Pl.'s EEO Aff.) at 1.  However, this purported adverse action was not asserted in the plaintiff's Complaint filed with this Court and therefore is not at issue in this case.

[10] The plaintiff's opposition is unnumbered; thus, the Court has taken the liberty of assigning page numbers to the opposition based on those assigned by the Court's electronic filing system.

subjected to "retaliation in violation of Title VII."  Id.  The transmittal letter accompanying the Final Agency Order is also dated December 19, 2006.  Id.  at 2.  The plaintiff does not recall when he received notice of the Final Agency Order.  Def.'s Stmt. ¶ 32; Def.'s Mem., Ex. 1 (Pl.'s Dep.) at 10:12-22.

## D.    The Filing of the Complaint

After receiving the adverse decision in response to his EEO Complaint, the plaintiff filed his original Complaint in this case on March 21, 2007.[11]  His initial filing was determined to be deficient due to the plaintiff's failure to properly name all parties in the caption, properly sign the Complaint, submit the requisite number of copies, and use the correct civil cover sheet.  Pl.'s Opp'n, Ex. 10 (March 21, 2007 Order Stating Deficiencies in Original Filing). The plaintiff re-filed his Complaint on April 5, 2007.[12]  In his new Complaint, the plaintiff asserts claims of discrimination, retaliation, and hostile work environment based on the Report of Contact and the Counseling E-mail.  "[The plaintiff] believes that the subject counseling and reports [that are the basis of this litigation] were predicated on racial animus, as opposed to an objective view of his performance."   Compl. ¶ 29; see also id. ¶ 40 (noting the discipline the plaintiff allegedly received followed his letters to his congressman).   The plaintiff contends that as the only African-American on his shift he was singled out for discipline.  See Pl.'s Opp'n, Ex. 2 (Pl.'s Dep.) at 72:19-73:10.  On December 20, 2010, the defendant filed his motion to dismiss or for judgment on the pleadings, or, in the alternative, for summary judgment.  In his motion, the defendant asserts the following: (1) "[the p]laintiff's claims are untimely because he filed his

---

[11]  The date designated for of this filing is based on the Court's time-stamp of March 21, 2007, even though the signature line on the civil cover sheet that the plaintiff submitted is dated March 17, 2007.  Pl.'s Opp'n, Ex. 9 (Time-Stamped Civil Cover Sheet dated March 21, 2007).

[12]  The date used here is the filing date indicated on the CM/ECF system.  However, the signature line on the plaintiff's Complaint is dated March 10, 2007, and the signature line on the civil cover sheet is dated April 4, 2005.

Complaint after the 90 day time limit specified in 42 U.S.C. § 2000e-16(c)," Def.'s Mem. at 1; (2) "[the p]laintiff improperly seeks to hold a federal agency liable for punitive damages under 42 U.S.C. § 1981 in Count II of his Complaint," id.; (3) "[the p]laintiff cannot show that he suffered any materially adverse action," id., as the Report of Contact and Counseling E-mail do not constitute such employment actions under Title VII; (4) the circumstances surrounding the Report of Contact and Counseling E-mail do not create an inference of discrimination or retaliation because they are "legitimate business practice[s]," id.; (5) even if the plaintiff has established a prima facie case of discrimination, the defendant has provided "non-discriminatory reason[s]," id. at 2, for its actions and the plaintiff has not established that those actions were merely pretextual; and (6) neither the Report of Contact nor the Counseling E-mail "rise to the level of creating a hostile work environment," id. at 1-2; see generally Def.'s Mem.

In opposition, the plaintiff responds that the Complaint was filed in a timely manner under 42 U.S.C. § 2000e-16. See Pl.'s Opp'n 1, 18-19. The plaintiff also challenges the defendant's allegations that the Report of Contact and Counseling E-mail are not considered adverse employment actions, and further asserts that the defendant's actions were discriminatory or retaliatory. See generally Pl.'s Opp'n.

## II. STANDARDS OF REVIEW

### A.   Federal Rule of Civil Procedure 12(b)(1)

"On a Federal Rule of Civil Procedure 12(b)(1) motion to dismiss, the plaintiff bears the burden of establishing by a preponderance of the evidence that the court has jurisdiction to entertain his [or her] claims." Green v. Stuyvesant, 505 F. Supp. 2d 176, 177 (D.D.C. 2007) (citations omitted). Because a motion for dismissal under "Rule 12(b)(1) presents a threshold challenge to the court's jurisdiction," Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987)

(citations omitted), the Rule requires dismissal of a complaint if the Court lacks subject-matter jurisdiction over the dispute, see Fed. R. Civ. P. 12(b)(1).  The Court must accept as true all of the factual allegations contained in the complaint when reviewing a motion to dismiss pursuant to Rule 12(b)(1). See Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164 (1993).  However, since the plaintiff has the burden of establishing the Court's jurisdiction, the "plaintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13-14 (D.D.C. 2001) (citation and internal quotation marks omitted).  Moreover, the Court is not limited to the allegations set forth in the complaint, and "may consider materials outside [of] the pleadings." Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (citation omitted).

**B.      Federal Rule of Civil Procedure 12(c)**

Rule 12(c) of the Federal Rules of Civil Procedure provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c).  The analysis of a Rule 12(c) motion is essentially the same as that for a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.  See Plain v. AT&T Corp., 424 F. Supp. 2d 11, 20 n.11 (D.D.C. 2006).  A plaintiff's Complaint may therefore be dismissed under Rule 12(c) where "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Lindsey v. D.C., 609 F. Supp. 2d 71, 77 (D.D.C. 2009) (quoting Longwood Village Rest. v. Ashcroft, 157 F. Supp. 2d 61, 66 (D.D.C. 2001)).  "[A C]omplaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, __ U.S. __, __, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S.

544, 570 (2007)).  A court analyzing a motion brought pursuant to Rule 12(c) must "assum[e] the alleged facts [as] true and draw[] all inferences in the plaintiff's favor."  Hall v. Lanier, 671 F. Supp. 2d 103, 105 (D.D.C. 2009).

## C.    Federal Rule of Civil Procedure 56

Before granting a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, this Court must find that "the pleadings, the discovery and disclosure materials on file, and any affidavits "show[] that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A material fact is one that "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  When ruling on a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000) (citations omitted).  The moving party has the burden of demonstrating the absence of a genuine issue of material fact, and that the non-moving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In responding to a summary judgment motion, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Accordingly, the non-moving party must not rely on "mere allegations or denials . . . but . . . must set forth specific facts showing that there [are] genuine issue[s] for trial."  Anderson, 477 U.S. at 248 (internal quotation and citation omitted) (second omission in original).  Thus, "[i]f the evidence is merely colorable, or is

not significantly probative, summary judgment may be granted." Id. at 249-50 (citations omitted).

## III. ANALYSIS

### A.  The Defendant's Motion to Dismiss the Complaint as Untimely

The first issue before the Court is the defendant's motion to dismiss the Complaint as untimely.  Under Title VII, "[w]ithin 90 days of receipt of notice of final action taken by a[n] . . . agency . . . an employee . . . may file a civil action."  42 U.S.C. § 2000e-16(c).  Courts apply the ninety-day limit strictly and "will dismiss a suit for missing the deadline by even one day." Woodruff v. Peters, 482 F.3d 521, 525 (D.C. Cir. 2007) (internal citation and quotation marks omitted).  However, failure to file in a timely manner is not a jurisdictional bar.  In re James, 444 F.3d 643, 647-48 (D.C. Cir. 2006) ("[n]either timeliness [n]or administrative exhaustion [is] jurisdictional") (citing Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 94-95 (1990)); see also Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 397 (1982) ("the provision [creating the deadline] for filing charges with the [Equal Employment Opportunity Commission] should not be construed to erect a jurisdictional prerequisite to suit in the district court").  Since the filing deadline is not jurisdictional, it is a requirement that, "like a statute of limitations, is subject to waiver, estoppel, and equitable tolling."  Zipes, 455 U.S. at 393.  However, "[f]ederal courts have typically extended equitable relief [to late filers] only sparingly."  Irwin, 498 U.S. at 96.  In determining when to grant the relief, "[courts] have allowed equitable tolling in situations where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period."  Id.

In the Title VII context, the statutory time limit to file a Complaint in federal court begins upon receipt of the final agency order.  See 42 U.S.C. § 2000e-16.  In order to determine when a

party received notice of a final agency decision, "[c]ourts generally presume that [the] plaintiffs receive decisions either three or five days after their issuance." McAlister v. Potter, 733 F. Supp. 2d 134, 143 (D.D.C. 2010) (internal citation and quotation marks omitted). Furthermore, "[c]ourts may also presume that the decision was mailed on the same day it was issued." Id. (internal citation and quotation marks omitted). Both of these presumptions are subject to rebuttal by "sworn testimony or other admissible evidence indicating the notice was [mailed or] received later." Id. (internal citation and quotation marks omitted).

Here, the Final Agency Order and Transmittal Letter is dated December 19, 2006. Def.'s Mem., Ex. 18 (Final Agency Order) at 2. Applying the presumptions identified in McAlister, 733 F. Supp. 2d at 143, the Court finds that the plaintiff received notice of the final agency action sometime between December 22 and December 26, 2006.[13] Ninety-days from those two dates would have been March 22 and March 26, 2007, respectively. The defendant claims that by not filing his judicial complaint until April 5, 2007, the plaintiff failed to file within the ninety-day statutory deadline, and therefore his Complaint should be dismissed as untimely. Def.'s Mem. at 7-8. However, "the original Complaint was originally filed on March 21, 2007," Pl.'s Opp'n at 19, which is within the statutory period, even assuming the plaintiff received the notice on the earliest possible date of December 22, 2006. See id., Ex. 9 (Time-Stamped Civil Cover Sheet dated March 21, 2007); id., Ex. 10 (March 21, 2007 Order Stating Deficiencies in Original Filing).

As noted above, the plaintiff's original Complaint, filed on March 21, 2007, was determined to be deficient. Pl.'s Opp'n, Ex. 10 (March 21, 2007 Order Identifying Deficiencies in Original Filing). While the plaintiff has not raised the issue of equitable tolling, the Court

---

[13] Five days after December 19, 2006 was Sunday, December 24, and because December 25 was a holiday, the latest the plaintiff likely received the letter under the three to five day presumption was December 26, 2006.

finds that the circumstances in this case fall squarely into the category for which equitable tolling is generally intended. Unlike a party who has missed the deadline based on the failure to exercise due diligence to preserve his legal rights, see Irwin, 498 U.S. at 96, the plaintiff here was apparently aware of the deadline and sought to initiate a civil case within the allotted time period. Therefore, because the plaintiff initially filed his Complaint within the ninety-day window required by Title VII, the Court must deny the defendant's motion to dismiss the Complaint on ground that its filing was untimely.

## B.    The Defendant's Motion to Dismiss the Section 1981 Claim (Count II)

The defendant asserts that the plaintiff's 42 U.S.C. § 1981 claims and his request for punitive damages must be dismissed pursuant to Federal Rule of Civil Procedure 12(c). See Def.'s Mem. at 2 (stating that the "[d]efendant moves for dismissal under Rule 12(b)(1), as the Court lacks jurisdiction over certain of [the p]laintiff's claims, and moves for judgment on the pleadings under Rule 12(c)"). Specifically, the defendant states that "[the p]laintiff's claim fails because this statutory provision does not apply to the federal government[,] . . . it only applies to states." Def.'s Mem. at 8-9. Furthermore, the defendant contends that Title VII "expressly prohibits a plaintiff from recovering punitive damages from a government, government agency or political subdivision."[14] Id. at 9 (internal citation and quotation marks omitted). In his opposition, the plaintiff fails to address the defendant's arguments pertaining to the request for dismissal of the section 1981 claim and his request for punitive damages. Under this Court's local civil rules, the Court may treat a motion as conceded if the non-moving party fails to file a timely memorandum in opposition to the moving party's motion. See Local Civ. R. 7(b) (authorizing the Court to "treat [a] motion as conceded" where "an opposing party [fails to] serve

---

[14] The Court addresses the plaintiff's request for punitive damages later in this Memorandum Opinion. See infra note 25.

and file a memorandum of points and authorities in opposition to the motion" within 14 days

from the date the motion is served); see also Buggs v. Powell, 293 F. Supp. 2d 135, 141 (D.D.C.

2003) (Walton, J.) ("It is understood in this Circuit that when a plaintiff files an opposition to a

dispositive motion and addresses only certain arguments raised by the defendant, a court may

treat those arguments that the plaintiff failed to address as conceded."). In the instant case,

whether the Court treats the defendant's arguments as conceded or not is immaterial, as the

plaintiff's claims must be dismissed in any event.

The Court will assess the defendant's challenge to the plaintiff's 42 U.S.C. § 1981 claim

under Rule 12(b)(1) because it implicates the Court's subject matter jurisdiction.

The defendant is being sued in his official capacity. See generally Compl. ¶ 5. A suit

against a government official in his official capacity "generally represent[s] only another way of

pleading an action against an entity of which an [official] officer is an agent," such that "an

official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."

Kentucky v. Graham, 473 U.S. 159, 165-66 (1985). Thus, the Court will proceed with its

analysis as if the plaintiff's section 1981 claim was brought against the Department of Veterans

Affairs or the United States itself. See Partovi v. Matuszewski, 647 F. Supp. 2d 13, 17 (D.D.C.

2009) (similarly construing a section 1983 claim against immigration and customs enforcement

employees in their official capacities as one brought directly against the United States), aff'd,

2010 WL 3521597 (D.C. Cir. Sept. 2, 2010); see also Strong-Fisher v. LaHood, 611 F. Supp. 2d

(D.D.C. 2009) (quoting Galvan v. Fed. Prison Indus., Inc., 199 F.3d 461, 463 (D.C. Cir. 1999))

(bringing a "suit against a government official in his official capacity is [the same as bringing] a

suit against the United States if 'the judgment sought would expend itself on the public treasury

or domain, or interfere with public administration'").

"[T]he United States, as [a] sovereign, is immune from suit save as it consents to be sued . . . , and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." United States v. Mitchell, 445 U.S. 535, 538 (1980). "A court cannot infer a waiver of sovereign immunity; it 'must be unequivocally expressed.'" Id. at 52-53 (quoting Mitchell, 445 U.S. at 538). The Supreme Court has held that "[section 2000e-16] of the Civil Rights Act of 1964 . . . provides the exclusive judicial remedy for claims of discrimination in federal employment." Brown v. Gen. Servs. Admin., 425 U.S. 820, 835 (1976). Applying Brown, this Court has stated "[b]ecause Title VII provides an exclusive remedy, claims covered by Title VII may not be brought under other federal statutes, including 42 U.S.C. § 1981." Strong-Fisher, 611 F. Supp. 2d at 53 (citing Kizas v. Webster, 707 F.2d 524, 542 (D.C. Cir. 1983)); see also Torre v. Barry, 661 F.2d 1371, 1374 (D.C. Cir. 1981) ("[A] federal employee who is covered by section [2000e-16] may not sue under section 1981 . . . .").

Thus, there having been no waiver of sovereign immunity authorizing suit against the federal government based on an alleged violation of section 1981, the Court lacks subject matter jurisdiction over the plaintiff's section 1981 claim. Therefore, the plaintiff's claim must be dismissed pursuant to Rule 12(b)(1).[15]

---

[15] The Court notes that even if sovereign immunity was not available to the government, the claim would still be dismissed because the statute, in relevant part, states "[t]he rights protected by this section are protected against impairment by nongovernmental discrimination and impairment committed "under color of State law." 42 U.S.C. § 1981(c). Courts have interpreted section 1981 to apply only to state officials—"42 U.S.C. §[] 1981 . . . [is] of no help to [the plaintiff] because [it applies] only to state officials, not federal defendants." Khaksari v. Chairman, Broad. Bd. of Governors, 689 F. Supp. 2d 87, 90 n.4 (D.D.C. 2010) (citing Strong-Fisher v. LaHood, 611 F. Supp. 2d 49, 52-54 (D.D.C. 2009)). The Court in Strong-Fisher noted, "the plain language of [section] 1981 support[s] the conclusion that instrumentalities of the federal government may not be sued under [section] 1981," and the protections of section 1981 prohibit discrimination and impairment committed "under color of State law." Strong-Fisher, 611 F. Supp. 2d at 53 (internal quotations and citations omitted); see also Prince v. Rice, 453 F. Supp. 2d 14, 25 (D.D.C. 2006) (quoting Davis v. U.S. Dep't of Justice, 204 F.3d 723, 725 (7th Cir. 2000) (per curiam)) ("Th[e l]anguage [of section 1981] simply 'does not apply to actions taken under color of federal law.'").

**C.      The Defendant's Motion for Summary Judgment**

**1.      The Plaintiff's Title VII Discrimination Claim**

Under Title VII "personnel actions affecting employees . . . in executive agencies . . .

shall be made free from any discrimination based on race . . . ." 42 U.S.C. § 2000e-16(a).  There

are two essential elements required to make a prima facie case of discrimination under Title VII:

"(i) the plaintiff [must have] suffered an adverse employment action (ii) because of the plaintiff's

race, color, religion, sex, national origin, age, or disability."  Kempthorne, 550 F.3d 1191, 1196

(D.C. Cir. 2008) (citing 42 U.S.C. § 2000e-16(a)).

Title VII claims of discrimination are decided according to the three-part test adopted in

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).[16]  Under the McDonnell Douglas

framework, a plaintiff must first establish a prima facie case of discrimination.  Id. at 802.  Once

the plaintiff has demonstrated a prima facie case, the burden then shifts to the defendant to assert

a non-discriminatory reason for its actions.  Id. at 802-03.  Finally, if a defendant asserts a non-

discriminatory reason for its actions, the burden once again shifts to the plaintiff to show the

reasons given by the defendant were pretextual.  Id. at 804.  Generally, once the defendant has

put forth non-discriminatory reasons for its actions, the "McDonnell Douglas framework – with

all its presumptions and burdens—is no longer relevant."  St. Mary's Honor Ctr. v. Hicks, 509

U.S. 502, 510 (1993).  When this occurs, "the sole remaining issue [is] discrimination vel non."

---

[16] The Court is aware of the District of Columbia Circuit's instructions when resolving certain Title VII cases at the summary judgment phase:  "In a Title VII disparate-treatment suit where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not—and should not—decide whether the plaintiff actually made out a prima facie case under McDonnell Douglas."  Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008).  However, the Brady instructions would not appear to apply in this case because unlike Brady, where the discrimination claim was based upon allegations of disparate treatment, here the plaintiff has not alleged disparate treatment, nor can he demonstrate that he suffered  an adverse employment action.

Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 143 (2000) (internal quotation marks omitted).

### a.        The Adverse Employment Actions Asserted by the Plaintiff

In this case, the plaintiff has failed to establish a prima facie case for discrimination under Title VII because he has not shown that he suffered an adverse employment action.  In this Circuit "[a]n employment action does not support a claim of discrimination unless it has 'materially adverse consequences.'"  Dorns v. Geithner, 692 F. Supp. 2d 119, 131 (D.D.C. 2010) (Walton, J.) (quoting Ginger v. District of Columbia, 527 F.3d 1340, 1343 (D.C. Cir. 2008)). And a "tangible employment action" has been defined by the Supreme Court as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998).  "[W]hile adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action."  Russell v. Principi, 257 F.3d 815, 818 (D.C. Cir. 2001).  The Circuit in Russell, reasoned that if all employment decisions with a negative or adverse effect were actionable, "[m]inor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would otherwise form the basis of a discrimination suit."  Id. (internal quotation marks omitted).  The requirement that an adverse employment action be tangible "guards against 'judicial micromanagement of business practices,'" Dorns 692 F. Supp. 2d at 132 (quoting Mungin v. Katten, Muchin & Zavis, 116 F.3d 1549, 1556 (D.C. Cir. 1997)), and "frivolous suits over insignificant slights," Dorns 692 F. Supp. 2d at 132 (quoting Russell, 257 F.3d at 818).  Notwithstanding this threshold, a series of independent actions taken together, none of which would be considered an adverse employment action alone, can constitute

an adverse employment action; however, "there is no bright line rule for determining when such impact has occurred." Dorns, 692 F. Supp. 2d at 134 (citing Baloch v. Norton, 517 F. Supp. 2d 345, 363 (D.D.C. 2007) (internal quotation marks omitted). Ultimately, when determining whether individual actions in the aggregate should be considered an adverse employment action, "courts must exercise their judgment carefully on a case-by-case basis." Norton, 517 F. Supp. 2d at 363.

In the context of this case, the Report of Contact and the Counseling E-mail do not constitute adverse employment actions.[17]  "There is a 'thick body of precedent [that] . . . refutes the notion that formal criticism or poor performance evaluations are necessarily adverse

_____

[17] The Court notes that in the plaintiff's Complaint he asserts that "the last three promotional opportunities in his department were awarded to Asian (Filipino) employees," implying that the plaintiff wanted these promotions for himself, or in the alternative, that his employer's promotion of only people of Asian descent constitutes discrimination.  Compl. ¶ 24.  It has long been recognized that failure to promote constitutes an adverse action. Kempthorne, 550 F.3d at 1196 (stating that typical adverse actions in employment discrimination cases include termination, denial of a job or promotion, and any reductions in salary or benefit).  However, the plaintiff has not provided any factual support for his assertions, and the defendant notes in his Reply that "[the plaintiff's] Complaint . . . does not allege that he was not selected for a position" but "merely mentions that the last three promotional opportunities in his department were awarded to Asian . . . employees."  Def.'s Reply at 6 (internal citation and quotation marks omitted).  Indeed, the plaintiff appears to concede this point, as the defendant's initial memorandum states that the "plaintiff alleges [only] two discriminatory acts in his Complaint: (1) the issuing of the January Report of Contact by Lee and (2) [the] February counseling."  Def.'s Mem. 13.  The plaintiff, in his opposition to the defendant's motion, responds by affirming the defendant's representation, stating:

> [The p]laintiff allege[s] that he was discriminated against on the basis of race, hostile work environment and reprisal for prior EEO activity when, 1) on January 19, 2005, [the p]laintiff was subjected to discrimination based on race (African-American), and harassment (hostile work environment), when Peregrina Lee, evening supervisor, sent him several email messages regarding incomplete laboratory specimens; 2) on February 18, 2005, [when the p]laintiff was subjected to discrimination based on race (African-American), and hostile work environment, when he received a counseling email from Peregrina Lee, evening supervisor, for not reading his email every day before he commence[d] work, and because of tardiness and 3) [the p]laintiff was subjected to reprisal, after he wrote a letter to his Congressman, Elijah E. Cummings, on or about December 10, 2004, concerning discrimination in hiring and promotions in the Pathology and Laboratory Service of the Veterans Affairs Medical Center in Washington, D.C.

Pl.'s Opp'n at 6-9.  The Court need not address whether the plaintiff has conceded that he is not asserting a failure to promote claim, as it is clear to the Court that the claim is untimely because the plaintiff failed to seek EEO counseling with regard to any such claim.  See Def.'s Mem., Ex. 18 (Final Agency Order), (Decision) at 1-2 (listing the issues presented to the EEO by the plaintiff).  Therefore, the plaintiff has failed to exhaust his administrative remedies as to any failure to promote claim and any such claim will be dismissed.  See Hamilton v. Geithner, 743 F.Supp.2d 1, 9 (D.D.C. 2010) (Walton, J.) (stating that "an employee must exhaust the administrative process . . . for each discrete action for which he or she seeks to bring a claim").

actions.'" <u>Dorns</u>, 692 F. Supp. 2d at 133 (quoting <u>Brown v. Brody</u>, 199 F.3d 446, 458 (D.C. Cir.

1999)).  The purported adverse employment actions at issue in the Complaint here are, at most,

formal criticisms of the plaintiff's job performance.   <u>See</u> Def.'s Mem., Ex. 11 (Report of

Contact) (stating, "[t]his report of contact serves as a verbal warning"); Def.'s Mem., Ex. 5

(Thompson Dep.) at 48:1-18 (describing a report of contact merely as a record of a verbal

warning); Def.'s Mem., Ex. 15 (Counseling E-mail) (recording the issues of tardiness and e-mail

protocol, which were discussed verbally earlier on February 18, 2005, between Lee and Turner).

In this Circuit, performance reviews, or criticisms of an employee's job performance are not

actionable, unless they are tied to the employee's bonus, or result in some other material

employment action.    <u>See</u> <u>Russell</u>, 257 F.3d at 819 (holding that there was an adverse

employment action where a lower performance rating led to a reduced bonus, which allowed the

plaintiff's claim to survive summary judgment).  Here, the plaintiff has not argued that either the

Report of Contact or the Counseling E-mail affected his benefits in any way or resulted in any

material changes to his employment.   Thus, independently, the two events fall short of

amounting to adverse employment actions.

Even when taken in the aggregate, the two incidents that the plaintiff alleges are adverse

employment actions fall well short of the level required in this Circuit.  <u>See</u> <u>Forkkio v. Powell</u>,

306 F.3d 1127, 1131 (D.C. Cir. 2002) (stating the following standard: "an employee suffers an

adverse employment action if he experiences materially adverse consequences affecting the

terms, conditions, or privileges of employment or future employment opportunities such that a

reasonable trier of fact could find objectively tangible harm"); <u>see, e.g.</u>, <u>Dorns</u>, 692 F. Supp. 2d

at 132-34 (finding that refusal of a request for transfer, a poor performance review, a refusal to

grant permission to attend training sessions, and a denial of an advancement for sick leave did

not, in the aggregate, constitute an adverse employment action); <u>Brodetski v. Duffey</u>, 199 F.R.D. 14, 21 (D.D.C. 2001) (holding that an insulting memorandum, misallocating responsibilities so that the plaintiff felt as though he was doing more work than others, and assigning him to work in isolation for long periods of time did not, even in the aggregate, constitute an adverse employment action). Thus, the Court concludes that the Report of Contact and Counseling E-mail, whether taken alone or viewed collectively, fall short of the level required in this Circuit, as demonstrated in <u>Dorns</u> and <u>Brodetski</u>, to constitute an adverse employment action. <u>See</u> <u>Taylor v. Small</u>, 350 F.3d 1286, 1293 (D.C. Cir 2003) (holding that an employee's placement in a performance improvement plan was not an adverse employment action upon which the employee could base a claim of discrimination).

### b.    The Defendant's Proffered Explanations for the Adverse Employment Actions

Even if the plaintiff were able to demonstrate a prima facie case of discrimination, the defendant has proffered legitimate, non-discriminatory reasons for the challenged actions, namely, "[the p]laintiff's failure to perform a spinal fluid analysis that had been endorsed to him by the Day Shift on January 12, 2005, . . . [the p]laintiff's failure to verify results for two patients on January 13, 2005," Def.'s Mem. at 15, and the plaintiff's "tardiness and his failure to read his e-mail in a timely manner," which was "[Pathology Service p]olicy," <u>id.</u> at 17-18. Thus, the "issue remaining [in] assessing [this] summary judgment motion is whether the plaintiff 'create[d] a material dispute on the ultimate issue of [discrimination] . . . either directly by [showing] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" <u>Dorns</u>, 692 F. Supp. 2d at 130 (quoting <u>Jones v. Bernanke</u>, 557 F.3d 670, 678 (D.C. Cir. 2009)). Here, the

Court finds that the plaintiff has failed to make a sufficient showing that the defendant's proffered explanation is unworthy of credence.

The plaintiff received the Report of Contact after he failed to review the communication log and verify a sample left by the day-shift, despite being given an opportunity to remedy this transgression.  See Def.'s Stmt. ¶ 14; Def.'s Mem., Ex. 3 (Lee Aff.) at 14:1-15:20; Def.'s Mem., Ex. 11 (Report of Contact).  In addition to the January 12, 2005 filing, the Report of Contact also listed two other instances in which the plaintiff failed to review samples left for him.  Def.'s Mem., Ex. 11 (Report of Contact).  It was not until after the plaintiff's work showed multiple errors and omissions, which occurred in a narrow time-frame that the plaintiff was issued a warning.  Def.'s Stmt. ¶ 16; Def.'s Mem., Ex. 11 (Report of Contact); see also Def.'s Stmt. ¶ 19 (citing Def.'s Mem., Ex. 12 (Work Performance Data for Turner)) (noting two other contemporaneous errors by the plaintiff for which a Report of Contact was not given).  Furthermore, the Counseling E-mail was in response to the plaintiff's repeated failure to report to work on time, which was severe enough to warrant his co-workers feeling compelled to complain to their supervisor.  Def.'s Stmt. ¶¶ 21-26; Def.'s Mem., Ex. 3 (Lee Aff.) at 25:10-18; Def.'s Mem., Ex. 15 (Counseling E-mail).  Thus, Lee's request that the plaintiff read his e-mails was similarly motivated by an interest in maintaining an efficient office environment "because there may [have been] directives pertaining to [the plaintiff's] work that need[ed] to be addressed before he start[ed] to work."  Def.'s Mem., Ex. 15 (Counseling E-mail).

The plaintiff advances a number of arguments as to why the reasons proffered by the defendant are pretextual.  First, he asserts that "[p]retext may be found where the complainant's qualifications are demonstrably superior to the selectee's," Pl.'s Opp'n at 23, and he argues that his superior qualifications can be garnered by the fact that Lee should have known that the Day

shift violated procedure by leaving the completion of the specimen for the Evening shift, "and if she didn't it illustrates the fact that [the plaintiff] had more knowledge about the procedures in the lab than she did," id. 23-24.  Furthermore, the plaintiff argues that his "superior knowledge was also evident, when he took exception to being docked for tardiness due to the weather, when there was a published policy for inclement weather," id. at 24, once again demonstrating that Lee's actions were discriminatory.  Next, he asserts that he was the only African-American on his shift.  Pl.'s Opp'n at 9 & Ex. 3 (Pl.'s Aff.) at 8.  Finally, the plaintiff cites the testimony of other employees to corroborate his statements and demonstrate that Lee's actions were pretextual.  Pl.'s Opp'n at 22-23.  The Court is not persuaded that any of this evidence demonstrates pretext.

The plaintiff cites Bauer v. Bailar, 647 F.2d 1037, 1048 (10th Cir. 1981), to support his argument that the defendant's proffered reasons for issuing the Report of Contact and the Counseling Email are pretextual.  However, the plaintiff's reliance on Bauer is misplaced.  In Bauer, the plaintiff was denied one of five supervisory positions being offered by her employer. Id. at 1040.  The plaintiff claimed that she had more experience than the other applicants and that her employer's decision to deny her application was based on gender discrimination. Id. at 1041. The court reasoned that "[i]t [did] not appear that [the plaintiff's] qualifications were so plainly superior as to require a finding of pretext." Id. at 1048.  The plaintiff surmises, based on his reading of Bauer, that "[p]retext may be found where [a] complainant's qualifications are demonstrably superior to [a] selectee's," Pl.'s Opp'n at 23, and the employer promoted the less qualified applicant.  However, the facts in the instant case are easily distinguishable from those in Bauer.  Here, the plaintiff's claim of discrimination is not based on denial of a promotion; rather, it arises out of two disciplinary actions taken by the defendant—the Report of Contact and

the Counseling Email.   In this context, the plaintiff's qualifications as compared to his supervisor's qualifications are irrelevant for purposes of establishing pretext.

Next, the plaintiff's representation that he was the only African-American in the department does not, alone, suggest the existence of racial animus.  See Singh v. U.S. House of Representatives, 300 F. Supp. 2d 48, 57 (D.D.C. 2004) ("The mere fact that Ms. Singh was the sole non-Caucasian on the Committee staff does not, without something more, suffice to make the necessary causal connection between Ms. Singh's race, color, and national origin and the alleged mistreatment.").[18]  The plaintiff offers nothing more than his own statement that he was treated differently than his other co-workers, stating, "[s]he was tough to me only, and I am the only black guy in the place[] [a]nd she wouldn't do that to everybody else[;] [t]hat was the problem."  Pl.'s Opp'n, Ex. 2 (Pl.'s Dep.) at 73:4-6.   However,  when considering a summary judgment motion "the Court need not rely on any 'conclusory allegations unsupported by factual [evidence].'"   Harris v. Wackenhut Servs., Inc., 648 F. Supp. 2d 53, 58 (D.D.C. 2009) (citing Pub. Citizen Health Research Grp. v. FDA, 185 F.3d 898, 908 (D.C. Cir. 1999)).

Lastly, the plaintiff claims that the testimony of other employees provides evidence of the management's racial animus.  However, a review of the cited testimony taken in context is not demonstrative of racial animus.[19]   See Def.'s Reply, Ex. 4 (Excerpts of Rajnikand Patel's Affidavit, September 15, 2005) at 9:6-10:22 (stating that the plaintiff appeared isolated and was possibly discriminated against by co-workers because they were speaking Tagalog, a predominant language in the Philippines, and could have been making discriminatory statements

---

[18] The Court notes that there is a dispute as to whether the plaintiff was indeed the only African-American working his particular shift in the lab.  See Def.'s Reply at 8 n.2.

[19] The Court has been able to find most of the documents cited in the plaintiff's brief, despite their format and the fact that many of the documents are not attached to the brief.  However, there are citations in the plaintiff's brief for which the Court has been unable to find the testimony referenced by the plaintiff.

about the plaintiff); Def.'s Reply, Ex. 5 (Excerpts of Mary Lucille Moyer Affidavit, September 19, 2005 ("Moyer Aff.") at 15:4-16:21 (noting that the plaintiff was labeled as a "troublemaker" and that the plaintiff had difficulty getting along with other employees, including herself); Def.'s Reply, Ex. 6 (Excerpts of Erlinda Bartolome-Orozco Affidavit, September 12, 2005 ("Bartolome-Orozco Aff.") at 10:12-12:1 (stating that although it appeared to her that the plaintiff felt he was being discriminated against, Lee "treats Mr. Turner fairly, just like she treats us").[20]   It appears that the plaintiff, as well as some of his co-workers, felt uncomfortable, or perhaps isolated, by the fact that their Filipino co-workers spoke Tagalog in the office. However, their feelings in this regard do not support the plaintiff's contention that the non-discriminatory reasons proffered by the defendant are mere pretext.   Accordingly, because the plaintiff has failed to establish that either the January 19, 2005 Report of Contact or the February 18, 2005 Counseling E-mail were motivated by anything other than a legitimate interest in maintaining an efficient and organized laboratory, as the defendant asserts, Def.'s Mem. at 17-18, summary judgment will be granted for the defendant on the plaintiff's discrimination claim.

---

[20] The plaintiff's use of Ms. Bartolome-Orozco's affidavit appears to be somewhat disingenuous.  The plaintiff states that the "alleged discrimination in the lab, both in the context of race and a hostile work environment, and his coworkers corroborat[ion of] his claims" support his argument that Lee's actions were racially motivated.  Pl.'s Opp'n at 22.  Specifically, he asserts that "[o]ne coworker, . . . a female Filipino, stated that 'we can see it.'"  Id. The plaintiff cites the Orozco Affidavit as the source of this evidence, Vol. I, Sec. 89, pp. 11-12, without actually submitting the cited materials with his brief.  However, the full quote from the affidavit, submitted with the defendant's reply, states

> Q. [by EEO Investigator Dottie Robinson] Has [the plaintiff] ever voiced to you that he feels he is being discriminated against?
> A. Not directly, no, he doesn't say that to us.  I mean we can see it, but he doesn't say it directly.

Def.'s Reply, Ex. 6 (Bartolome-Orozco Aff.) at 11:19-12:1 (emphasis added).  Viewed in context, it appears that Ms. Bartolome-Orozco is stating that she and her co-workers can "see" that the plaintiff feels he is being discriminated against, not that he is actually the victim of discrimination, considering that Ms. Bartolome-Orozco also stated in response to a question on how Lee treated the plaintiff that "[Lee] treat[ed] Mr. Turner fairly, just like she treat[ed] us."  Id., Ex. 6 (Bartolome-Orozco Aff.) at 10:12-14.

### 2.      The Plaintiff's Title VII Retaliation Claim

The analysis in assessing a retaliation claim under Title VII is very similar to the analysis used in evaluating a discrimination claim.  "In order to establish a prima facie case of retaliation, a plaintiff must show: 1) [he] engaged in a statutorily protected activity; 2) that the employer took an adverse personnel action; and 3) that a causal connection existed between the two." Morgan v. Fed. Home Loan Mortg. Corp., 328 F.3d 647, 651 (D.C. Cir. 2003) (internal quotation marks and citations omitted); Norton, 517 F. Supp. 2d at 353; see also Kempthorne, 550 F.3d at 1198 (citing 42 U.S.C. § 2000e-3(a)).  Furthermore, claims of retaliation are also interpreted under the same burden-shifting framework of McDonnell Douglas.  Lathram v. Snow, 336 F.3d 1085, 1089 n.3 (D.C. Cir. 2003).  Here, the defendant does not dispute that the plaintiff's letters to his congressman constitute "statutorily protected activity."  See Morgan, 328 F.3d at 651.  Thus, the Court need only to focus on steps two and three of the analysis.

### a.      The Adverse Employment Actions Asserted by the Plaintiff

The standard for determining what qualifies as an adverse employment action is not as demanding for claims of retaliation in contrast to claims for discrimination.  For claims of retaliation, "an adverse action is one that is 'harmful to the point that [the employer's action] could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" Dorns, 692 F. Supp. 2d at 132 (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57, 64 (2006) (holding "that the antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment")).  Thus, under Burlington, the standard for an adverse employment action in the retaliation context "involve[s] something short of what would ordinarily be considered 'personnel action' (e.g., denial of promotion, discharge, salary reduction)."  Dorns, 692 F. Supp. 2d at 132 (quoting

Rattigan v. Gonzales, 503 F. Supp. 2d 56, 75 (D.D.C. 2007)).   However, despite this lower standard, "[a]ctionable retaliation claims are [still] limited to those where an employer causes 'material adversity,' not 'trivial harms.'"   Wiley v. Glassman, 511 F.3d 151, 161 (D.C. Cir. 2007) (quoting Burlington, 548 U.S. at 68).   Title VII's retaliation standards exist "to prevent employer interference with unfettered access to Title VII's remedial mechanisms . . . [a]nd normally petty slights, minor annoyances, and simple lack of good manners will not create such a deterrence."   Porter v. Fulgham, 601 F. Supp. 2d 205, 217 (D.D.C. 2009), rev'd on other grounds sub nom. Porter v. Shah, 606 F.3d 809 (D.C. Cir. 2010) (quoting Burlington, 548 U.S. at 68).

As was the case with the plaintiff's claim of discrimination, the two alleged adverse employment actions proffered by the plaintiff to establish retaliation fail to rise to the requisite level for a prima facie case of retaliation under Title VII.   See supra Part III.C.1.a.  For example in Baloch v. Kempthorne, Secretary of the Interior, 550 F.3d 1191 (D.C. Cir. 2008), the plaintiff failed to establish that a letter of counseling and a letter of reprimand rose to the requisite level to be considered an adverse employment action.   Specifically, the District of Columbia Circuit found that because the letters "contained no abusive language, but rather job-related constructive criticism, which [could] prompt an employee to improve [his] performance," the plaintiff had failed to successfully establish that the either letter constituted an adverse action.   Id. at 1199 (citation and internal quotation marks omitted).   Similarly, in Williams v. Dodaro, 576 F. Supp. 2d 72 (D.D.C. 2002), one of the plaintiff's retaliation claims was based on the fact that her supervisor issued her a letter requesting that she "keep [the supervisor] timely and fully informed of all matters of importance to the office going forward."   Id. at 78.  The letter was in response to the supervisor's belief that the plaintiff was failing to keep her informed of important events

taking place in the office.  Id.  The Court concluded that "a letter remind[ing the plaintiff] that she was required to keep [her supervisor] apprised of significant developments in the office" did not constitute an adverse employment action as "the letter did not indicate that it was a reprimand . . . and it did not lead to any disciplinary action."  Id. at 89.  The letter complained of in Williams is very similar to the e-mails complained of by the plaintiff here, and, like the Williams court, this Court agrees that they do not constitute adverse employment actions.  Furthermore, in Dorns, this Court found that a request for a lateral transfer, a lower than expected performance review, a refusal to allow attendance at training classes, and a denial of advanced sick leave did not, individually or in the aggregate, rise to the level of an adverse employment action for a successful retaliation claim.  692 F. Supp. 2d at 131-34.  Finally, in Reshard v. Lahood, this Court determined that a letter of warning, which contained a threat of future punishment if the recipient continued to fail to perform at an unacceptable level, did not constitute an adverse employment action since no negative consequences followed.  No. 87-2794, 2010 WL 1379806 at *20 (D.D.C. April 7, 2010) (Walton, J.).  Here, the adverse employment actions alleged by the plaintiff were not even as significant as those complained of in Dorns and Reshard; accordingly, despite the less stringent standard required to demonstrate an adverse employment action in the Title VII retaliation claim context, Burlington, 548 U.S. at 64, the Report of Contact and Counseling E-mail fail to meet even that standard.  See Taylor v. Solis, 571 F.3d 1313, 1321 (D.C. Cir. 2009) (holding that the lowering of an employee's performance evaluation on two occasions did not constitute an adverse employment action because the employee failed to show that the reduction negatively impacted her position, grade level, salary, or promotion opportunities); Kempthorne, 550 F.3d at 1191 (holding that a letter of

counseling and a letter of reprimand did not rise to the requisite level to be considered an adverse employment action).

### b.   Causality and the Defendant's Proffered Reasons for the Adverse Employment Action

Even if the plaintiff had met his burden by establishing a prima facie case of retaliation under Title VII, the claim would still fail due to the lack of causation between his statutorily protected actions and the adverse employment actions alleged.   As noted earlier, the third requirement of Morgan requires "a causal connection… between [the statutorily protected action and the adverse employment action]."   328 F.3d at 651.   "As a matter of law, there can obviously be no retaliation if the [alleged] retaliator did not know about the protected activity."   Barber v. Am. Sec. Bank, 655 F. Supp. 775, 779 (D.D.C. 1987).

Here, the plaintiff has offered nothing more than his own conclusory statements that Lee knew he had written letters to his congressman and the individuals involved in Lee's selection prior to the disciplinary actions taken against him.   In the plaintiff's Complaint, his only allegation that Lee took retaliatory action against the plaintiff in response to his participation in protected activity is his statement that "[t]he discipline [the plaintiff] received, followed his criticism of the Department to his congressman."   Compl. ¶ 40; see also Pl.'s Opp'n at 25-26 ("Shortly after I made an inquiry to my Congressman about the promotion practice's [in the Department] . . . the Evening/Night Supervisor . . . teamed up with the other newly appointed Supervisors/Lead Tech making a case from some work that was initiated on the Dayshift and should have been completed on the Dayshift.").[21]   In contrast to the conclusory statements in his Complaint and opposition, the record, and even the plaintiff's own testimony, reveal that Lee

---

[21] The plaintiff's memorandum cites this submission as "RO/, Vol. I, Sec. A4."   While the Court has been able to locate many of the sources the plaintiff has incorrectly cited in his opposition, the source material cited here remains a mystery.

was unaware of the plaintiff's protected activity until after she had issued the Report of Contact

and the Counseling E-mail.  Def.'s Mem., Ex. 3 (Lee Aff.) at 6:6-7:7 (stating that Lee did not

learn of the letter to the congressman until approximately mid-August); Def.'s Mem., Ex. 2 (Pl.'s

EEO Aff.) at 3 (stating that plaintiff did not think his supervisor knew of his protected activity);

Def.'s Mem., Ex. 1 (Pl.'s Dep.) at 126:2-128:11 (stating that the plaintiff knew only three co-

workers who were aware of his letter to his congressman).  Consequently, the actual record

repudiates, rather than supports, the plaintiff's claim that Lee retaliated against him for sending

complaints to his congressman and the individuals involved in Lee's selection.

The plaintiff's only remaining assertion supporting his claim of a causal connection,

beyond his conclusory statements, is that the alleged adverse employment actions occurred in

close proximity to his protected activity.  See Compl. ¶ 40; Pl.'s Opp'n at 25-26.  "[T]emporal

proximity between the <u>employer's knowledge</u> of the protected activity and the adverse

employment action is sufficient to show a causal connection, [but] such proximity must be 'very

close.'"  Drewrey v. Clinton, 763 F. Supp. 2d 54, 64 (D.D.C. 2011) (emphasis added) (citing

Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001)).  Here, although the plaintiff has

demonstrated facts sufficient to establish that the letters he wrote complaining of the hiring

practices of his office and the e-mails from his supervisor and the subsequent Report of Contact

occurred within one and two months respectively, he has failed to show that Lee had knowledge

of his protected activity prior to the alleged adverse actions, much less in close proximity to that

activity.  See Def.'s Mem., Ex. 2 (Pl.'s EEO Aff.) at 3 (stating that the plaintiff did not believe

Lee knew of his protected activity); Ex. 3, (Lee Aff.) at 6:20-22; 7:1-7 (stating that Lee only

learned of the plaintiff's protected activity in August of 2005); Ex. 1 (Pl.'s Dep.) at 126:2-22;

127:1-22; 128:1-11 (admitting that only three of his fellow employees knew about his letter to

Congressman Cummings and none of those people included Lee).   Thus, while temporal proximity can form the basis for establishing a prima facie case for retaliation, there is still a requirement that the supervisor had knowledge of the protected activity at the time the alleged retaliation occurred.   See Test v. Holder, 614 F. Supp. 2d 73, 83 (D.D.C. 2009) (finding that the plaintiff failed to demonstrate a prima facie case of retaliation because "[h]is supervisors did not know about his [protected] activity until" after the adverse action was being taken. "Accordingly, [the plaintiff was unable to] satisfy the causal connection requirement of a prima facie retaliation case as to his [adverse employment action].") (emphasis added, internal quotation marks omitted); see also Drewery, 763 F. Supp. 2d at 64.

Finally, even if the plaintiff had established a factual basis for a nexus between Lee's actions and the knowledge the plaintiff's other supervisor or co-workers allegedly had about his statutorily protected activity,[22] for the reasons stated above, supra Part III.C.1.b at 20-25, the plaintiff has failed to show that the defendant's proffered reasons for the supposed adverse employment actions are mere pretext for impermissible retaliation.   The plaintiff, having failed to establish a prima facie case for retaliation, and because no reasonable juror could find that Lee's actions were taken for a retaliatory purpose, summary judgment must be granted for the defendant on the plaintiff's retaliation claim.

---

[22] The Court notes that even if the plaintiff could show that his co-workers' were aware of his protected activity, their knowledge cannot be imputed to Lee.  The nexus is not between Lee's actions and the co-worker's knowledge of the plaintiff's protected activity, but rather a nexus between Lee's knowledge and the plaintiff's protected activity, which cannot be shown based on what his co-workers knew.  See Drewery, 763 F. Supp. 2d at 63 ("Nor are the statements made by . . . the plaintiff's co[-]workers sufficient to allow a reasonable juror to infer discriminatory or retaliatory motives on behalf of the defendant." "Accordingly, . . . the plaintiff's . . . [reliance on] conclusory allegations by his coworkers are [in]sufficient to demonstrate pretext and overcome the defendant's legitimate non-discriminatory reason." ).

### 3.      The Plaintiff's Hostile Workplace Environment Claim

The Court appreciates that the plaintiff's Complaint does not explicitly assert a hostile

work environment claim, and makes only fleeting references of harassment.  See Compl. ¶ 31.

However, both parties discuss the claim in their briefs, and therefore, the Court will address

whether a hostile work environment claim survives the defendant's motion.[23]  A prima facie case

for a hostile workplace claim requires the plaintiff to show that:

> (1) [he] is a member of a protected class; (2) [he] was subjected to unwelcome
> harassment; (3) the harassment occurred because of the plaintiff's protected
> status; (4) the harassment affected a term, condition, or privilege of employment;
> and (5) the employer knew or should have known about the harassment, but
> nonetheless failed to take steps to prevent it.

---

[23] In assessing whether a hostile work environment claim has been raised by the plaintiff and survives the defendant's motion, the Court has treated the parties' briefing of the claim as a constructive amendment of the plaintiff's Complaint.  Important to the Court, having taken this approach is the fact that a number of other courts confronting similar situations have taken the position that a complaint was constructively amended when the parties had fully briefed an issue that was not necessarily raised in the complaint.  Furthermore, other courts have specifically found support for this practice pursuant to Federal Rule of Civil Procedure 15(b)(2).  Rule 15(b)(2) requires that "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if raised in the pleadings."  The District of Columbia Circuit initially took the position that this "general principle" of constructive amendment applies at the summary judgment stage.  Kulkarni v. Alexander, 662 F.2d 758, 762-63 (D.C. Cir. 1978).  However, it subsequently took the opposite position "[b]ecause a case decided on motion for summary judgment does not reach trial."  Harris v. Sec'y, U.S. Dep't of Veterans Affairs, 126 F.3d 339, 344 n.3 (D.C. Cir. 1997).  The Circuit's most recent comment on the matter is that "[i]t is an open question whether the Federal Rules permit parties to impliedly consent to 'try' issues not raised in their pleadings through summary judgment motions."  Indep. Petroleum Ass'n of Am. v. Babbitt, 235 F.3d 588, 596 (D.C. Cir. 2001).

  In light of this uncertainty, the Court has opted to side with the Circuits that allow a constructive amendment and find support for this position in Rule 15(b) when a ruling on summary judgment motions is being rendered.  See Handzlik v. United States, No. 03-50580, 2004 WL 315042, at *17 (5th Cir. Feb. 13, 2004) (finding that Rule 15(b) may be applied at the summary judgment stage); PETA v. Doughney, 263 F.3d 359, 367-68 (4th Cir. 2001) (finding constructive amendment where an issue was raised for the first time in the plaintiff's motion for summary judgment, it was objected to by the defendant and addressed by the district court in its summary judgment ruling); Cruz v. Coach Stores, Inc., 202 F.3d 560, 569 (2d Cir. 1999) (finding that Rule 15(b) applies at the summary judgment stage where the defendant did not show it had been prejudiced by the district court's consideration of the issue); Whitaker v. T.J. Snow Co., 151 F.3d 661, 663 (7th Cir. 1998) (finding that a complaint was constructively amended to include an issue that both parties addressed in their summary judgment briefs); Suiter v. Mitchell Motor Coach Sales, Inc., 151 F.3d 1275, 1279-80 (10th Cir. 1998) (applying Rule 15(b) to a defense raised in a motion for summary judgment); Smith v. Transworld Sys., Inc., 953 F.2d 1025, 1030 (6th Cir. 1992) (same); Jackson v. Hayakawa, 605 F.2d 1121, 1129 (9th Cir. 1979) (same);  but see Crawford v. Gould, 56 F.3d 1162, 1168-69 (9th Cir. 1995) (holding that because the case was decided on motions for summary judgment and not at trial, Rule 15(b) does not apply); Blue Cross and Blue Shield of Alabama v. Weitz, 913 F.2d 1544, 1550 (11th Cir. 1990) (holding that "Rule 15(b) is inapposite where…there was no trial because the district court decided the case at the summary judgment stage).

Dorns, 692 F. Supp. 2d at 135-36 (citing Hendricks v. Paulson, 520 F. Supp. 2d 65, 89 (D.D.C. 2007)).  A hostile workplace is created "[w]hen the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the condition of the victim's employment and create an abusive working environment."  Harris v. Forklift Sys., 510 U.S. 17, 21 (1993) (internal quotation marks and citations omitted).  The Supreme Court in Harris went on to explain that "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment . . . is beyond Title VII's purview."  Id. Importantly, the Court stated that in reviewing claims of a hostile workplace environment, a court must look at "the frequency of the discriminatory [or retaliatory] conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Id. at 23.

The level of conduct required to give rise to a claim of hostile work environment must "be extreme [and] amount to a change in the terms and conditions of employment."  Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).  The conduct that causes a change in the employee's work condition must also be the result of discrimination or retaliation based on a protected status, because "[e]veryone can be characterized by sex, race, ethnicity or (real or perceived) disability; and many bosses are harsh, unjust and rude."  Nurriddin v. Goldin, 382 F. Supp. 2d 79, 107 (D.D.C. 2005).  As every employee can be classified in some manner, "[i]t is therefore important [that] hostile work environment cases . . . exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination [or retaliation; o]therwise, the federal courts will become a court of personnel appeals."  Id.  Indeed, the standard for a hostile work environment exists in order to "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-

related jokes, and occasional teasing," Faragher, 524 U.S. at 788 (internal citations omitted), as Title VII cannot be used as a "general civility code for the American workplace."  Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998).

The two employment actions alleged by the plaintiff, the Report of Contact and the Counseling E-mail, were not sufficient to create a hostile workplace environment.  Neither of the actions were so "severe or pervasive [as] to alter the condition[] of the [plaintiff's] employment." Harris, 510 U.S. at 21.  Rather than suggesting harassment based on the plaintiff's race, the record shows that the two acts were merely "ordinary tribulations of the workplace which fall outside the purview of Title VII."  Pearsall v. Holder, 610 F. Supp. 2d 87, 99 (D.D.C. 2009) (internal quotation marks omitted) (stating that transfer to an inferior office, denial of training, denial of permission to telecommute, exclusion from certain meetings, and a general underutilization of the plaintiff's skills and experience did not create a hostile workplace environment); see also Dorns, 692 F. Supp. 2d at 136 (ruling that a request for a lateral transfer, a lower than expected performance review, a refusal to allow attendance at training classes, and a denial of advanced sick leave did not, individually or in the aggregate, create a hostile work environment).

The plaintiff's brief cites affidavits of his co-workers in his attempt to demonstrate that a hostile workplace environment existed.  Pl.'s Opp'n at 22-23.  The plaintiff cites these statements for the purpose of showing that he felt isolated from his Filipino co-workers who would speak in Tagalog and that the reputation accorded to him as a "troublemaker" was racially motivated.  Id.  However, the plaintiff has failed to show that racial animus was the basis for these events.  While his co-workers speaking in another language may have caused the plaintiff to feel ostracized, that impact alone was not enough to create a hostile work environment.  See

Nichols v. Billington, 402 F. Supp. 2d 48, 68 (D.D.C. 2005) ("The fact that the plaintiff believe[d] she was getting the cold shoulder from her co-workers [did] not constitute a materially adverse consequence or disadvantage in the terms and conditions of her employment so as to establish an adverse personnel action.").   Also, the plaintiff has failed to show that he was labeled as a troublemaker out of racial animus.  Def.'s Reply, Ex. 5 (Moyer Aff.) at 15:4-8.[24]  It appears that the plaintiff had workplace issues with nearly all of his co-workers over the plaintiff's "different approach to things."   Id., Ex. 5 (Moyer Aff.) 15:1-4, 16:4-22.   This, however, does not demonstrate that a hostile work environment existed, or if it did, that the creation of that environment can be attributed to the defendant.   Accordingly, the defendant is entitled to summary judgment on this claim.[25]

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that it must deny the defendant's motion to dismiss the plaintiff's Complaint on the ground that it was not filed in a timely manner. However, the defendant's motion to dismiss both Count II and the plaintiff's request for punitive damages is granted.  Finally, the Court grants the defendant's motion for summary judgment on the plaintiff's claims for discrimination, retaliation, and hostile workplace environment.

---

[24] The Court notes that even if the plaintiff could show that his co-workers' perspectives about him were the result of racial animus, such attitudes cannot be attributed to his supervisor, unless the plaintiff could demonstrate that Lee knew about the feelings of his co-workers and failed to take measures to address the situation.  Moreover, for those attitudes to be actionable, the plaintiff would also have to show that those attitudes of the co-workers created a hostile work environment.   The plaintiff has not established such circumstances in either respect in this case.

[25] Because none of the plaintiff's claims have survived the defendant's motion, the Court need not address his request for punitive damages.

**SO ORDERED** this 15th day of November, 2011.[26]

REGGIE B. WALTON
United States District Judge

---

[26] This Memorandum Opinion accompanies the Order issued on September 28, 2011 and the Amended Order being issued contemporaneously with this opinion.